AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
### for the
District of Delaware

**SEALED**

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>A black Galaxy Note 9 SM-960 U with IMEI:<br>756567091591014; and, A black Samsung SM-N975U<br>with IMEI: 359188100335744 | )<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. 20 - 274 M

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT A

located in the _____ District of _____ **Delaware** _____ , there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | | Offense Description |
|---|---|---|
| 18 U.S.C. § 1201(c) | Kidnapping | |

**FILED**

**OCT 22 2020**

U.S. DISTRICT COURT DISTRICT OF DELAWARE

The application is based on these facts:

See attached Affidavit

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Kristopher M. Long, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ Telephone _____ *(specify reliable electronic means).*

Date: _____ 10/22/2020 _____

The agent's Signature
and his Penalty
were confirmed
on 10/22/20

_____
*Judge's signature*

City and state: Wilmington, Delaware

Chief, U.S. Magistrate Judge Mary P. Thynge
*Printed name and title*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

IN THE MATTER OF THE SEARCH OF:

A black Galaxy Note 9 SM-960 U with IMEI: 756567091591014; and,

A black Samsung SM-N975U with IMEI: 359188100335744;

CURRENTLY LOCATED AT:

Federal Bureau of Investigations
Wilmington Resident Agency
500 Delaware Avenue, Wilmington, Delaware

Case No. 20-274M

### AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Kristopher M. Long, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—two electronic devices—which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.     I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been since on or about March 6, 2016. I attended New Agent training at the FBI Academy in Quantico, Virginia. I am currently assigned to the Baltimore Field Office, Wilmington Resident Agency. I received extensive training and experience in the investigations of international and domestic terrorism violations and, among other things, have conducted or participated in surveillances, debriefings of informants, review of taped conversations and records, and the execution of search and tracking warrants. From these experiences, and from training relating to

counterterrorism matters, I am familiar with the ways in which persons finance and plan a terrorist operation, to include but not limited to, the efforts persons involved in such activity take to disguise operations and avoid detection by law enforcement. In addition, I have been a Special Agent Bomb Technician for the FBI for approximately five years. During this time, I have attended multiple training courses related to the production and deployment aspects of homemade explosives/devices. Furthermore, I have assisted in multiple investigations related to Improvised Explosive Devices ("IEDs") and Improvised Incendiary Devices.

3.     This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

4.     The property to be searched is: (a) a black Galaxy Note 9 SM-960 U with IMEI: 756567091591014 ("TARGET TELEPHONE #1"); and, (b) a black Samsung SM-N975U with IMEI: 359188100335744 ("TARGET TELEPHONE #2") (collectively, the "TARGET TELEPHONES"). The TARGET TELEPHONES are currently located at the FBI Wilmington Resident Agency, 500 Delaware Avenue, Wilmington, Delaware.

5.     The applied-for warrant would authorize the forensic examination of the TARGET TELEPHONES for the purpose of identifying electronically stored data particularly described in Attachment B.

## FACTS SUPPORTING PROBABLE CAUSE

## I.     CONSPIRACY TO KIDNAP THE GOVERNOR OF MICHIGAN

6.     The United States, including the FBI, is investigating a conspiracy to kidnap the Governor of Michigan. Title 18, United States Code, Section 1201(c) makes it a felony to conspire to kidnap or abduct any person and hold that person for ransom, reward, or otherwise,

2

where the kidnapper or the victim crosses a state boundary, or a means of interstate commerce (such as a cellular telephone or the internet) is used in committing, or in furtherance of, the offense.

7. The subjects of this investigation include Barry Gordon CROFT, Jr., Adam FOX, Ty GARBIN, Kaleb FRANKS, Daniel HARRIS, and Brandon CASERTA (collectively, the "CONSPIRATORS"). The CONSPIRATORS were charged via Criminal Complaint in the Western District of Michigan on October 6, 2020 with one count of conspiracy to commit kidnapping, in violation of 18 U.S.C. § 1201(c) (1:20-mj-416). The investigation is ongoing.

8. In the course of its investigation, the FBI relied on information provided by Confidential Human Sources ("CHS") and Undercover Employees ("UCE") over several months. Not all CHSs and UCEs were present at all times, however, at least one CHS or UCE was usually present during the group meetings. Those CHSs and UCEs consensually recorded the meetings and conversations with the subjects. Some meetings or conversations were recorded by more than one CHS or UCE. Certain CHSs also had access to group or individual texts, online chats, and phone calls. Each CHS was vetted for reliability by the FBI agent handling the source. None of the CHSs were aware of the other CHSs involved with the groups in order to preserve the independence of their reporting. Although multiple CHSs were used over the course of the investigation, this affidavit only relies on audio recordings and information provided by CHS-1, CHS-2, UCE-1 and UCE-2.

3

**A. Group Meeting in Ohio to Discuss the Operation**

1.       On June 6, 2020, CROFT, FOX and approximately 13 other people from several states gathered in Dublin, Ohio.[1] CHS-1 was present at this meeting.[2] The group talked about creating a society that followed the U.S. Bill of Rights and where they could be self-sufficient. They discussed different ways of achieving this goal from peaceful endeavors to violent actions. At one point, several members talked about state governments they believed were violating the U.S. Constitution, including the government of Michigan and Governor Gretchen Whitmer. Several members talked about murdering "tyrants" or "taking" a sitting governor. The group decided they needed to increase their numbers and encouraged each other to talk to their neighbors and spread their message. As part of that recruitment effort, FOX reached out to a Michigan based militia group (the "militia group").

2.       The militia group had already been brought to the attention of the FBI by a local police department in March 2020, when members of the militia group were attempting to obtain the addresses of local law-enforcement officers. At the time, the FBI interviewed a member of the militia group who was concerned about the group's plans to target and kill police officers, and that person agreed to become a CHS.

---

[1] During this meeting and subsequent meetings, CHS reports and recordings indicate that the CONSPIRATORS, including CROFT, consumed marijuana.

[2] The FBI has paid CHS-1 approximately $8,600 to date for expenses. CHS-1 does not have a criminal history and has been deemed reliable by the FBI. Information given by CHS-1 has been shown to be reliable and corroborated through review of recordings and physical surveillance. That meeting was recorded and provided to the FBI.

**B. Attempted Recruitment of the Militia Group and Others**

3.      As reported by CHS-2[3] and confirmed by the FBI, the militia group periodically meets for field training exercises ("FTX")[4] on private property in remote areas of Michigan, where they engage in firearms training and tactical drills. CHS-2 told the FBI that, at a FTX on June 14, 2020, one of the founders of the militia group said he had been introduced to FOX. During that exercise, the militia group leadership had a call with FOX, who invited them to meet at his business in Grand Rapids, Michigan, later in the week.

4.      FOX, in coordination with CROFT, met with members of the militia group at various times in June 2020. During one such meeting on June 18, 2020, which was audio recorded by CHS-2, FOX, militia group leadership, including Michigan resident GARBIN, and CHS-2 met at a Second Amendment rally at the State Capitol in Lansing, Michigan. In an effort to recruit more members for the operation, FOX told GARBIN and CHS-2 he planned to attack the Capitol and asked them to combine forces.

**C. The Operation Focuses on Governor Whitmer**

5.      As previously discussed, the FBI was able to monitor much of the activity between FOX and others through the use of CHSs. On June 14, 2020, CHS-2 participated in a consensually recorded telephone call with FOX, who described the meeting in Dublin, Ohio.

---

[3] The FBI has paid CHS-2 approximately $14,800 to date, for reporting and expenses. CHS-2 does not have a criminal history and has been deemed reliable by the FBI. Information given by CHS-2 has been shown to be reliable and corroborated through review of recordings and physical surveillance. CHS-2 also consensually recorded certain meetings and provided those recordings to the FBI.

[4] The individuals identified in this affidavit often refer to a "field training exercise" as an "FTX" and, as such, the same is done in this affidavit.

FOX said he needed "200 men" to storm the Capitol building in Lansing, Michigan, and take hostages, including the Governor. FOX explained they would try the Governor of Michigan for "treason," and he said they would execute the plan before the November 2020 elections.

6. On June 20, 2020, FOX, GARBIN, and several other individuals, including CHS-2, met at FOX's business in Grand Rapids. As part of FOX's operational security, the attendees met in the basement of the shop, which was accessed through a trap door hidden under a rug on the main floor. FOX collected all of their cellular phones in a box and carried them upstairs to prevent any monitoring. CHS-2 was wearing a recording device, however, and captured the audio from the meeting. The attendees discussed plans for assaulting the Michigan State Capitol, countering law enforcement first responders, and using "Molotov cocktails" to destroy police vehicles. The attendees also discussed plans for an additional meeting during the first weekend of July when they also would conduct firearms and tactical training.

7. On June 25, 2020, FOX live-streamed a video to a private Facebook group that included CHS-2, in which he complained about the judicial system and the State of Michigan controlling the opening of gyms. FOX referred to Governor Whitmer as "this tyrant bitch," and stated, "I don't know, boys, we gotta do something. You guys link with me on our other location system, give me some ideas of what we can do." The video was preserved by the FBI.

### D.  Training and Planning to Kidnap the Michigan Governor

8. On June 28, 2020, FOX, FOX's girlfriend, GARBIN, Michigan resident FRANKS, Michigan resident CASERTA, and CHS-2 attended a tactical training exercise at the Munith, Michigan, residence of a militia-group member. After the training, FRANKS left the residence. Other people, including FOX, GARBIN, CASERTA, and CHS-2 remained at the residence and were told to leave if they were not willing to participate in attacks against the

6

government and in kidnapping politicians. FOX, GARBIN, CASERTA, and CHS-2 stayed for the rest of the meeting. FRANKS left before the end of the night, though his departure does not appear to be related to FRANKS' commitment to the conspiracy.[5]

9.      Over the weekend of July 10-12, 2020, FOX, CROFT, GARBIN, FRANKS, CASERTA, CHS-2, and others attended a FTX in Cambria, Wisconsin. Based on E911 data from CROFT's cell phone and CHS reporting, I am aware that during this meeting CROFT stayed nearby in Portage, Wisconsin. Attendees participated in firearms training and other combat drills. On July 11, at the exercise, CROFT and a member of the militia group attempted to construct an IED, using black powder, balloons, a fuse, and BBs for shrapnel. CROFT, GARBIN and the militia group member attempted to make a second IED using similar components. The construction of the devices was faulty, and they did not detonate as planned. CHS-2 provided FBI with video of the event. FRANKS also brought and fired a rifle with a silencer at the exercise. Attendees shared photos and video recordings of the exercise in Facebook discussions that included CHS-2.

10.      On July 18, 2020, GARBIN, FOX, CROFT, HARRIS, FRANKS, CHS-2, and other individuals met in Ohio. CHS-2 provided the FBI with an audio recording of the meeting. The attendees discussed attacking a Michigan State Police facility, and in a separate conversation after the meeting, GARBIN suggested shooting up the Governor's vacation home, which is located in the Western District of Michigan ("the vacation home.") The same day, GARBIN told

---

[5] On July 7, 2020, FRANKS attended a meeting at the residence of another militia group member, and CHS-2 was in attendance. FRANKS said that he was "not cool with offensive kidnapping" and added that he was "just there for training," or words to that effect. After the meeting, however, FRANKS actively continued to participate in the kidnapping plot, as further described below.

CHS-2 and others that he did not want to go after the Capitol. He said he was "cool" with going after the Governor's vacation home, however, even if it only resulted in destruction of property.

11. On July 27, 2020, CHS-2 met FOX at his business in Grand Rapids. CHS-2 provided the FBI with an audio recording of the meeting. FOX said their best opportunity to abduct Governor Whitmer would be when she was arriving at, or leaving, either her personal vacation home or the Governor's official summer residence. Both residences are located in the Western District of Michigan. FOX described it as a "Snatch and grab, man. Grab the fuckin' Governor. Just grab the bitch. Because at that point, we do that, dude -- it's over." FOX said that after kidnapping the Governor, the group would remove her to a secure location in Wisconsin for "trial." FOX suggested they get a realtor to help them find the exact location of the vacation home and collect information on the surrounding homes and structures. FOX discussed the importance of knowing the layout of the yard, homes, and security. FOX stated they needed to map out the surrounding property and gates, and they needed plumbers and electricians to help them read blueprints to refine their strategy. FOX also suggested recruiting an engineer or "IT [Information Technology] guy," a "demo guy," and other "operators."

12. On July 27, 2020, FOX asked in an encrypted group chat, which included GARBIN, HARRIS, FRANKS and CHS-2, "OK, well how's everyone feel about kidnapping?" No one responded to the question.

13. On July 28, 2020, FOX told CHS-2 over the phone that he had narrowed down his attack targets to the vacation home and the summer residence. The call was not recorded. The same day, FOX posted the following to a private Facebook page: "We about to be busy ladies and gentlemen . . . This is where the Patriot shows up. Sacrifices his time, money, blood sweat and tears . . . it starts now so get fucking prepared!!"

8

14.     On August 9, 2020, FOX, GARBIN, HARRIS, FRANKS, and CHS-2 participated in a tactical training in Munith, Michigan. CHS-2 provided the FBI with an audio recording of the training. FOX asked the group about kidnapping Governor Whitmer. According to CHS-2, GARBIN initially expressed reluctance to talk about the plan in that setting. After the training, FOX, CHS-2, and others participated in a group call that was recorded by CHS-2. FOX suggested another member of the militia group could gather information about Governor Whitmer's primary residence in Lansing, and FOX discussed destroying the Governor's boat. After the call, FOX, FRANKS, GARBIN, HARRIS, and CHS-2 communicated in an encrypted group chat. In that chat, HARRIS stated, "Have one person go to her house. Knock on the door and when she answers it just cap her . . . at this point. Fuck it." He added, "I mean . . . fuck, catch her walking into the building and act like a passers-by and fixing dome her then yourself whoever does it." (sic). In a follow-up chat about the plan, FRANKS told CHS-2, "OK sounds good I'm in for anything as long as its well planned."

15.     On August 18, 2020, in an encrypted group chat that included FOX, HARRIS, GARBIN, FRANKS, CHS-2, and others, FRANKS expressed interest in taking part in a surveillance of the vacation home. In an effort to locate the Governor's vacation home, one of the members named specific cities where it could be located and told the group to check these cities. In a private chat later on August 18, 2020, the same person told CHS-2 the name of the lake in northern Michigan where the vacation home is located, and he said he was looking for an escape route using a boat on the lake.

### E.  The Group Uses Operational Security Measures to Avoid Detection

16.     The CONSPIRATORS often communicate via encrypted online platforms and use "code words" or phrases to describe their plans in a self-proclaimed effort to avoid law-

enforcement detection. For example, on July 24, 2020, CHS-2 and GARBIN contacted FOX by telephone. The call was recorded by CHS-2. FOX said he had researched the Governor's office online, and he believed that the Governor kept only a ceremonial office in Lansing. FOX wondered aloud whether the group just needed to "party it out, make a cake and send it," in what CHS-2 believed was a coded reference to sending a bomb to the Governor. FOX discussed the need to train for the next three months to be ready to engage. FOX stated, "In all honesty right now . . . I just wanna make the world glow, dude. I'm not even fuckin' kidding. I just wanna make it all glow dude. I don't fuckin' care anymore, I'm just so sick of it. That's what it's gonna take for us to take it back, we're just gonna have to everything's gonna have to be annihilated man. We're gonna topple it all, dude. It's what great frickin' conquerors, man, we're just gonna conquer every fuckin' thing man." FOX and GARBIN further discussed the need for the government to collapse because it has become so tyrannical.

17.     On July 26, 2020, FOX told CHS-2 that he had not heard back from the "baker," which the CHS understood to mean an explosives manufacturer. FOX told the CHS that he thought it might be better to focus on the vacation home and summer residence as potential targets. FOX also said, "Maybe we should just make a bunch of cupcakes and send them out," in an apparent reference to a more widespread bombing campaign. CHS-2 understood these code words and phrases because the group often used such language when talking about explosives.

18.     On August 23, 2020, GARBIN, HARRIS, FRANKS, CASERTA, CHS-2, and three other individuals met at HARRIS's residence in Lake Orion, Michigan. CHS-2 provided FBI with an audio recording of the meeting. The group had discussed concerns about being infiltrated by law enforcement, and all attendees were required to bring personal documents to confirm their identities. During the meeting, CASERTA asked FRANKS, "Franks, where you

10

at?" FRANKS responded, "Same place. I'm ready to get it on. Doesn't matter. It could be 'cause

somebody looked at us wrong." CHS-2, referring to FOX, stated, "He is all about fuckin' killin'

her." CASERTA responded, "God. Go on someone's property and stuff like that. I would rather

not scare them. Especially if it's a fuckin' political parasite. The world would be better without

that person, I'll say that." CHS-2 explained that was why FOX wanted to do "recon" for the plan.

The group discussed surveilling the vacation home in preparation for attacks on the Governor,

and FRANKS advised he had recently spent almost $4,000 on a helmet and night-vision goggles.

To address their concerns about law-enforcement infiltration, the attendees agreed to move their

group chat to a different encrypted messaging application. Because the group still included CHS-

2, the FBI has maintained the ability to consensually monitor the chat communications.

### F.  The CONSPIRATORS Conduct Surveillance of the Governor's Home on Two Occasions

<u>Daytime Surveillance on August 29, 2020</u>

19.     On August 29, 2020, FOX, CHS-2, and another individual conducted surveillance

of the vacation home. CHS-2 provided FBI with an audio recording of the operation. FOX used

his cell phone to attempt to locate the residence, but initially they had trouble finding it. He

contacted a friend who had assisted them in the past; the friend told him where the vacation

home was located and sent pictures of the home from the internet. FOX and the other individual

located the vacation home, took photographs and slow-motion video from their vehicle as they

drove by it, and discussed conducting additional surveillance from the water at a later date. The

other individual then looked up the locations of the local police department and Michigan State

Police in the area, and used them to estimate how long it would take law enforcement to respond

to an incident at the vacation home. During the surveillance operation, FOX said, "We ain't

11

gonna let 'em burn our fuckin' state down. I don't give a fuck if there's only 20 or 30 of us, dude, we'll go out there and use deadly force."

20.     On August 30, 2020, FOX shared photos from his surveillance trip to the encrypted chat group, which included FRANKS, HARRIS, GARBIN and CHS-2. GARBIN offered to paint his personal boat black to support the surveillance of the vacation home from the lake where the vacation home is situated. In a text message conversation the same day, GARBIN asked CHS-2 how the surveillance trip had gone. CHS-2 shared a screenshot of a map of the area, which happened to show a bridge in the vicinity. Using symbols and emoticons, GARBIN replied "If the 👮 go 💀, it also ✖ the 🚓," suggesting demolition of the bridge would hinder a police response. CHS-2 provided the FBI with an image of a hand-drawn map of the lake near the vacation home with the mileage of the nearest police departments and the estimated response time. CHS-2 provided FBI with a picture of FOX drawing that map.

<u>Nighttime Surveillance on September 12-13, 2020</u>

21.     Over the weekend of September 12-13, 2020, FOX, CROFT, GARBIN, FRANKS, HARRIS, CASERTA, CHS-2, a UCE, and another individual attended a FTX at GARBIN's property in Luther, Michigan. Based on E911 data from CROFT's cell phone and CHS reporting, I am aware that during this meeting CROFT stayed nearby in Big Rapids, Michigan. The location of the meeting is approximately an hour and a half from the vacation home. CHS-2 and the UCE audio recorded the meetings and exercise. CROFT brought what he referred to as his "chemistry set," which included components for an IED. According to CHS-2, CROFT constructed an IED by removing the cap from a commercial firework, adding additional black powder, and wrapping the device in pennies and electrical tape as shrapnel. During the

12

exercise, the group set the device in a clearing surrounded by human silhouette targets, and CROFT detonated it to test its anti-personnel effectiveness.

22.    At the exercise, FOX took aside CROFT, GARBIN, FRANKS, CASERTA, CHS-2, two UCEs, and four other people. FOX briefed them on the plan to kidnap Governor Whitmer, and he told them about his first surveillance of the property. FOX selected CROFT, GARBIN, FRANKS, the CHS, the UCEs, and the four other people, to conduct a nighttime surveillance of the vacation home in preparation for the kidnapping. HARRIS, CASERTA, and another individual remained at the camp in Luther. HARRIS became aware of the surveillance the next day, and he expressed regret that he had not participated in the surveillance operation.

23.    On September 12, 2020, while driving from GARBIN's property to Cadillac to bring others to the property, FOX told CHS-2 and another individual that the vacation home is the Governor's actual house, "And it's a perfect fuckin' setup. Out of everywhere that she resides, this is the only one that's probably actually feasible with a success rate." That conversation was recorded by CHS-2.

24.    During the late night of September 12 and early morning of September 13, the group drove from Luther to the vicinity of the vacation home in three separate vehicles. CHS-2 and the UCEs audio recorded the operation. Before leaving Luther, CROFT asked FOX if the surveillance participants were armed. FOX confirmed that they were, and CROFT suggested they take the opportunity to conduct an act of violence that night. CROFT was eventually dissuaded of this notion and decided to wait for a better time.

25.    FOX, CROFT, CHS-2, a UCE, and an individual from Wisconsin traveled in the first vehicle. While in the vehicle, CROFT and FOX discussed detonating explosive devices to divert police from the area of the vacation home. They stopped at the M-31 highway bridge on

13

the way, where FOX and the UCE inspected the underside of the bridge for places to seat an explosive charge. FOX took a picture of the bridge's support structure, which he later shared with CHS-2 in their encrypted chat. From there, they drove to a public boat launch across the lake from the vacation home to watch for the other cars in their group.

26.     GARBIN, FRANKS, and another individual from Wisconsin traveled in the second vehicle to the vicinity of the vacation home. A digital dash camera was mounted in the vehicle and was activated to record the surveillance for later reference. This footage was later shared with CHS-2, who provided it to the FBI. External-facing video footage from the camera shows what the CONSPIRATORS observed of the Governor's neighborhood, while the internal-facing footage captured GARBIN, FRANKS, and the other member inside the vehicle on the way to the vacation home. A review of the dash camera footage revealed global positioning system ("GPS") data indicating that the vehicle was located in close proximity to the vacation home next to the lake. When the second vehicle arrived, the team contacted FOX, who was located in the first vehicle, to determine if they could see each other's lights across the lake. GARBIN asked the first vehicle, "Can you see my light?" CROFT asked the second vehicle, "You got our guys?" CHS-2 replied, "We got you."

27.     Two of the other individuals and a UCE drove to the lake in the third vehicle. They were tasked by FOX to drive around and make sure no one was following or surveilling the group.

28.     During the surveillance operation, FOX stated, "She fucking goddamn loves the power she has right now" and that "she has no checks and balances at all. She has uncontrolled power right now." CROFT stated, "All good things must come to an end." FOX also remarked "I

14

can see several states takin' their fuckin' tyrants. Everybody takes their tyrants." The group also discussed how many people should be involved in the kidnapping operation.

29.     During the ride back to GARBIN's property, FRANKS stated "We're doin' all the reconnaissance work, so it should go smooth." After arriving back at GARBIN's property, CHS-2 asked, "Everybody down with what's going on?" and someone stated, "If you're not down with the thought of kidnapping, don't sit here." GARBIN replied, "Oh no, we're not kidnapping, that's not what we're doing," which sparked general laughter. Amidst the laughter, another voice said, "No children!" and a voice added, "We're *adult* napping." FRANKS stated, "Kidnapping, arson, death. I don't care." The group then started discussing destroying the vacation home.

### G. The CONSPIRATORS Begin Finalizing Plans to Kidnap Governor Whitmer

30.     On the morning of September 13, 2020, the group reconvened at GARBIN's property in Luther, Michigan. FOX gathered CROFT, GARBIN, FRANKS, HARRIS, CASERTA, CHS-2, the UCEs and two other individuals. CHS-2 recorded the discussion. FOX confirmed with the members that they were the group that was going to kidnap Governor Whitmer. A UCE told FOX that it will cost approximately $4,000 to procure the explosives that FOX and CROFT want to use to blow up the bridge leading to the vacation home. FOX later shared that information with the group. The group agreed to conduct a final training exercise in late October.

31.     On September 14, 2020, FOX posted in the group's encrypted chat that he did not want the exercise to be the last week in October because it would leave insufficient time to execute the kidnapping before the national election on November 3, 2020. The group agreed to use the time until the final training exercise to raise money for explosives and other supplies.

15

32.     On September 17, 2020, on an encrypted group chat that included FOX,

GARBIN, FRANKS, HARRIS, CASERTA, CHS-2, and others, FOX asked the group what it

thought of a militia group invitation to participate in an armed protest at the State Capitol.

GARBIN replied, "I would highly advise minimizing any communication with him. Also there

needs to be zero and i mean zero public interaction if we want to continue with our plans."

CASERTA replied, "When the time comes there will be no need to try and strike fear through

presence. The fear will be manifested through bullets." FOX responded, "Copy that boys, loud

and clear!"

33.     On September 30, 2020, FOX called CHS-2 on the phone and CHS-2 recorded

the conversation. During the call, FOX discussed purchasing a taser for use in the kidnapping

operation. FOX also told CHS-2 that CROFT, GARBIN, HARRIS, FRANKS, CASERTA, and

others were aware of the $4,000 cost. On October 2, 2020, FOX confirmed he purchased an

800,000 volt taser in an encrypted chat message with CHS-2.

34.     FBI's review of recent encrypted group chats indicates that, in preparation for

their plan to kidnap Governor Whitmer, FOX, GARBIN, HARRIS, and FRANKS plan to meet

with a UCE on October 7, 2020, to make a payment on explosives and exchange tactical gear.

CASERTA said he could not attend because he will be at work. CROFT has returned to

Delaware and is not available for this exchange.

35.     On several occasions, FOX has expressed his intention and desire to kidnap

Governor Whitmer before November, 3, 2020, the date of the national election.

**II.    ARREST OF CROFT AND SEIZURE OF THE TARGET TELEPHONES**

36.     On October 6, 2020, the Honorable Sally J. Berens, United States Magistrate

Judge for the Western District of Michigan, signed a Criminal Complaint charging the

16

CONSPIRATORS with conspiracy to commit kidnapping in violation of 18 U.S.C. § 1201(c)

(1:20-mj-416). An arrest warrant for CROFT was issued on that same date.

37.     CROFT is long haul truck driver employed by Chris Cross, LLC, a Delaware-

based company. On October 6, 2020, CROFT picked up the truck he drives for Chris Cross,

LLC, in Delaware and drove overnight. He stopped in North Haven Connecticut at

approximately 5:00 a.m. on October 7, 2020 and spent most of the day resting at this location. In

the late afternoon CROFT began driving his truck route, generally travelling south. CROFT was

surveilled by law enforcement who confirmed that CROFT was the only individual in the truck

and had been the only individual in the truck for several hours.

38.     Late on the evening of October 7, 2020, CROFT stopped at a convenience store in

southern New Jersey. After exiting his truck, he was arrested pursuant to the federal warrant. At

the time of the arrest, CROFT provided verbal and written consent to search his truck. During the

consent search, the TARGET TELEPHONES were located on the passenger seat of the truck.

39.     The TARGET TELEPHONES are currently in the lawful possession of the FBI

and stored at the FBI Wilmington Resident Agency, 500 Delaware Avenue, Wilmington,

Delaware. In my training and experience, I know that the TARGET TELEPHONES have been

stored in a manner in which its contents are, to the extent material to this investigation, in

substantially the same state as they were when the TARGET TELEPHONES first came into the

possession of the FBI.

40.     CROFT has communicated and shared photographs, video recordings, and other

digital media with other CONSPIRATORS using encrypted messaging applications and social

media platforms. Based on my training and experience I am aware that encrypted messaging

applications and social media platforms can be accessed via a cellular telephone.  I am also

17

aware that CROFT has posted videos on social media that appear to have been filmed in the cab of his truck. I therefore have reason to believe that the TARGET TELEPHONES will contain messages, plans, photographs, videos and other evidence of his participation in the conspiracy to kidnap Governor Whitmer.

## TECHNICAL TERMS

41.     Based on my training and experience, I use the following technical terms to convey the following meanings:

      a.  Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

18

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an

19

extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, which is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets

typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g. Pager: A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network. Some pagers enable the user to send, as well as receive, text messages.

h. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

i. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

21

42.     Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online at http://www.samsung.com/us/mobile, I know that the TARGET TELEPHONES have capabilities that allow them to serve as wireless telephones, digital cameras, portable media players, GPS navigation devices, portable WiFi hotspots, portable audio and video recording devices, portable internet access / search devices, and networking devices, including email, social media networks, and other communication applications ("apps"). In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

### ELECTRONIC STORAGE AND FORENSIC ANALYSIS

43.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

44.     There is probable cause to believe that things that were once stored on the Device may still be stored there, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered montbs or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file

22

on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

45.  *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

23

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is

24

evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

46. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to *computer*-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

47. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

///

48.     I submit that this affidavit supports probable cause for a search warrant
authorizing the *examination* of the TARGET TELEPHONES described in Attachment A to seek
the items described in Attachment B.

Kristopher M. Long
Special Agent, FBI

Sworn to and subscribed this ___ day of October 2020.

Honorable Mary Pat Thynge
Chief United States Magistrate Judge

Sworn to me over the telephone and signed by me pursuant to Fed. R. Crim. P. 4.1

26

## ATTACHMENT A

### Property to be Searched

The property to be searched is: (a) a black Galaxy Note 9 SM-960 U with IMEI: 756567091591014 ("TARGET TELEPHONE #1"); and, (b) a black Samsung SM-N975U with IMEI: 359188100335744 ("TARGET TELEPHONE #2") (collectively, the "TARGET TELEPHONES"). The TARGET TELEPHONES are currently located at the FBI Wilmington Resident Agency, 500 Delaware Avenue, Wilmington, Delaware.

**ATTACHMENT B**

**Particular Things to be Seized**

1.    All records on the TARGET TELEPHONE described in Attachment A that relate

to the conspiracy to kidnap Governor Whitmer, in violation of 18 U.S.C. § 1201(c), and involve

Barry Gordon CROFT, Jr. and his co-conspirators, including:

      a.  Communications and emails relating in any way to the conspiracy;

      b.  Contact lists, address books, or identifiers related in any way to the conspiracy or

         the conspirators;

      c.  Calendar entries related in any way to the conspiracy;

      d.  Images or videos relating in any way to the conspiracy;

      e.  Digital voice recorded messages discussing or related in any to the conspiracy;

      f.  Phone records relating in any way to the conspiracy;

      g.  Text messages, including SMS/MMS messages and messages contained in

         messaging applications installed on the DEVICE (including any photos videos, or

         media exchanged) concerning or relating in any way the conspiracy;

      h.  Maps, notes or plans relating in any way to the conspiracy;

      i.  GPS or location data related in any way to the conspiracy;

      j.  All records and information related to firearms, ammunition, firearms-related

         parts and accessories;

      k.  All records and information related to explosive devices and components

         designed or intended for use in assembling explosive devices;

      l.  All records and information related to Radio Frequency Interference (RFI)

         scanners or other counter-surveillance equipment;

2

m. All records and information, including podcasts, related to extremist literature and paraphernalia;

n. All records and information related to military-style gear and accessories, including helmets, night vision goggles, and tactical clothing;

o. Any information recording or related to the conspirators' schedule or travel related in any way to the conspiracy;

p. All bank records, checks, credit card bills, account information, and other financial records related in any way to the conspiracy;

q. All records related to any storage facility owned, controlled, or used by Barry Gordon CROFT, Jr.; and,

r. All records relating to hotel stays in Dublin, Ohio, Portage, Wisconsin, Peebles, Ohio, and Big Rapids, Michigan.

2.    Evidence of user attribution showing who used or owned the TARGET TELEPHONES at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law

enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

4